## IN THE SUPERIOR COURT OF GUAM

| PEOPLE OF GUAM, | CRIMINAL CASE NO. CF0825-24 |
|---|---|
| vs. | DECISION AND ORDER |
| **JAY RYAN GAZA** **BRIAN ANDREW MENDIOLA,** | |
| Defendants. | |

### INTRODUCTION

This matter came before the Honorable Vernon P. Perez on March 5, 2025, for hearing on Defendant Brian Andrew Mendiola's ("Mendiola") Motion to Suppress. Present were Assistant Attorney General J. David Griffin on behalf of the People of Guam ("the Government"); Mendiola with counsel, Assistant Alternate Public Defender Tyler Scott; and Co-Defendant Jay Ryan Gaza ("Gaza") with counsel, Deputy Public Defender John P. Morrison. Having reviewed the pleadings, the arguments presented, and the record, the Court now issues the following Decision and Order.

### BACKGROUND

On December 13, 2024, Mendiola was indicted with one count of Possession of a Schedule II Controlled Substance (As a Third Degree Felony) and a Notice: Commission of a Felony While on Felony Release. (Indictment, Dec. 13, 2024). Gaza was indicted with the following charges: (1) Possession of a Schedule IV Controlled Substance (As a Third Degree Felony); (2) Possession of a Firearm without Valid Identification (As a Third Degree Felony);

and (3) Speeding (As a Violation). *Id.* These charges stem from the discovery of a cylindrical container containing unknown pills; a rifle hard-case; and a meth pipe containing suspected methamphetamine residue in Gaza's vehicle during the effectuation of a traffic stop on or about December 5, 2024. (Decl. of Matthew Wermager, Magistrate's Compl., Dec. 6, 2024).

On January 23, 2025, Mendiola filed the instant Motion to Suppress.

On February 6, 2025, the Government filed its Opposition.

On March 5, 2025, at the Suppression Hearing, Gaza orally joined in the Motion. The Court heard sworn testimony from Guam Police Department ("GPD") Officers Jeremiah De Chavez, Edgar Tiamzon, and Matthew P. Cepeda. The Court then gave the parties leave to file proposed Findings of Fact and Conclusions of Law.

On March 18, 2025, Gaza submitted a Proposed Decision and Order. The Court did not receive any proposed findings from Mendiola or the Government. The Court subsequently placed the matter under advisement.

At the Suppression Hearing, the Court ascertained the following facts:

1. On the night of December 5, 2024, Federal Task Officers were conducting surveillance of the Granada Apartments in Tamuning for drug trafficking. Sergeant Cepeda testified that the surveillance involved officers from DEA, ATF, and GPD SIS.

2. While the investigation was going on at the Granada Apartments, Officer De Chavez and Sergeant Cepeda were parked at the Shirleys Coffee Shop in Tamuning. Officer De Chavez was driving an unmarked GPD vehicle and Sergeant Cepeda was in the passenger seat. Officer De Chavez testified that he had been at the parking lot for a while and that GPD had effectuated other pull overs relative to the drug investigation.

3. Around 10:00 p.m., Officer De Chavez observed a Kia speeding on Carlos Camacho Street. The Kia was observed earlier by one of the surveillance teams at the Granada Apartments. A target individual was identified entering the vehicle for a short period of time before exiting the vehicle.

4. Officer De Chavez testified that he followed the Kia, paced it, and could not keep up at forty-five miles per hour. Officer De Chavez testified that some slight traffic near

the intersection of Governor Carlos Camacho Road and Route 1 helped him catch up. Officer De Chavez was able to catch up and observed the vehicle make a right turn onto Route 1. Officer De Chavez paced the vehicle around 50 miles per hour.

5. Officer De Chavez could not recall if the light was green or red at the Route 1 intersection. Officer De Chavez testified that the traffic was clear, however, so he was able to drive right through.

6. Sergeant Cepeda could not recall getting behind the vehicle on Governor Carlos Camacho Road and testified that they were not able to catch up to the vehicle until it had just turned right onto Route 1.

7. As Officer De Chavez was about to activate his lights and sirens to effectuate a pull over, the vehicle made a left turn into the East Agana Mobil and came to a stop at one of the gas pumps near the front entrance of the Mobil store.

8. Officer De Chavez activated his lights when he pulled behind the vehicle at the gas pump. Officer De Chavez testified that the blue lights were on during the entire interaction.

9. Officer De Chavez approached the driver, who was identified as Defendant Gaza. Officer De Chavez advised Gaza why he was there and inquired why Gaza was speeding. Officer De Chavez requested Gaza's driver's license and vehicle registration. Gaza provided both.

10. Officer De Chavez indicated he verified Gaza's documents by checking the expiration dates and the name on the registration and driver's license. The vehicle belonged to Gaza's mother.

11. Officer De Chavez testified that if a driver is able to provide both a valid driver's license and car registration, he does not notify or call dispatch to check.

12. Officer De Chavez acknowledged that he did not just issue Gaza a ticket for speeding or issue him a warning and let him go.

13. Officer De Chavez testified that as he was reviewing Gaza's documents, he was also looking around the vehicle to see if there is any potential danger. Officer De Chavez

observed a clear cylinder-shaped container with what appeared to be pills inside on the floorboard by Gaza's right foot. Officer De Chavez could not identify the type of pill from outside the vehicle.

14. Officer De Chavez later testified that the pills appeared to be Xanax after he got a closer look. Additional pills were also found in the center console and in a brown backpack. The backpack was located on the floor of the front passenger's seat. Mendiola denied ownership of the backpack.

15. Officer De Chavez asked Gaza to step out of the vehicle because he wanted to talk to him and get into the vehicle.

16. Officer De Chavez conducted a pat down of Gaza, to which no weapons were found.

17. Officer De Chavez requested for permission to search the vehicle. Gaza seemed hesitant to give a response and said he wasn't sure. Officer De Chavez requested permission again and Gaza stated no.

18. Officer De Chavez noted a change in Gaza's responses when he asked to search the vehicle, which appeared to be nervousness.

19. Officer De Chavez testified that he also tried to request for a K-9 unit, however, there was no K-9 unit available on duty.

20. Officer De Chavez had Gaza stand towards the back of the vehicle with Special Agent Jason Roman. Officer De Chavez also had Mendiola exit the vehicle.

21. Officer De Chavez then went back to the vehicle to look around. Officer De Chavez looked into the vehicle with a flashlight.

22. Officer De Chavez observed a black hard plastic type case in the back of the vehicle that he believed was a rifle case based on his training and experience.

23. Officer De Chavez also observed what appeared to be a firearm magazine on the driver's seat. Officer De Chavez was not completely sure from where he was standing because he was not as familiar with that particular type of magazine and the angle it was viewed from.

24. Officer De Chavez approached Gaza and asked him if that was a rifle case in the back of the vehicle. Gaza responded yes; it was. Officer De Chavez asked if there was a rifle inside and if he had a firearms identification card.

25. Officer De Chavez then read Gaza his *Miranda* rights.

26. Officer De Chavez could not recall if he gave Gaza's driver's license and registration immediately back to him.

27. Officer De Chavez acknowledged that there was nothing about the cylinder alone which suggested its only purpose was for criminal activity.

28. Officer De Chavez testified that Gaza told him that he had a prescription for Alprazolam.

29. Officer De Chavez testified that he did not tell Gaza that he could leave.

30. Officer De Chavez testified that if the defendants had requested to leave, he would have had to let them go.

31. When the officers confirmed that there was a rifle in the back seat, Officer De Chavez arrested Gaza, placed him in handcuffs, and sat him down on the curb.

32. When Officer Edgard Tiamzon and Jason Roman arrived on the scene, the occupants of the vehicle were still inside. Officer Tiamzon observed Officer De Chavez speaking with the operator of the vehicle. Officer Tiamzon kept an eye on the passenger of the vehicle.

33. Officer Tiamzon was later apprised by Officer De Chavez that there was a firearm inside the vehicle. Officer Tiamzon confiscated the rifle and magazine clip.

34. Officer Tiamzon could not recall if he spoke to anyone in the vehicle.

35. Officer Tiamzon could not recall if there was any other container in the vehicle containing medicine and was not involved with confiscating any drugs.

36. Sergeant Cepeda engaged the passenger, later identified as Mendiola, when he exited the vehicle. Sergeant Cepeda engaged in "small talk" with him and explained why they were there. Sergeant Cepeda told Mendiola that they just needed to do what they

needed to do and then if everything was clear, they would be free to go. Sergeant Cepeda acknowledged that at that time, the driver and passenger were detained.

37. Mendiola was calm and cooperative and did not appear to be under the influence.

38. Sergeant Cepeda took a quick glance at the vehicle as he approached Mendiola, but did not see anything noteworthy immediately.

39. Sergeant Cepeda testified that it was standard for officers to use their flashlight to view into a vehicle during a traffic stop at night for safety concerns.

40. Sergeant Cepeda testified about three or four other officers came to the scene in two vehicles, parked behind his and Officer De Chavez's vehicle. Sergeant Cepeda testified the officers were standing towards the back, just observing.

## DISCUSSION

The Fourth Amendment to the U.S. Constitution "protects against unreasonable searches and seizures and is made applicable to Guam via section 1421(b)(c) of the Organic Act of Guam." *People v. Chargualaf*, 2001 Guam 1 ¶ 14 (internal citations omitted). Brief investigative detentions are permitted under the Fourth Amendment "when a police officer has reasonable suspicion that an individual was engaged in or is about to be engaged in illegal conduct." *People v. Johnson*, 1997 Guam 9 ¶ 4 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "As a general matter, the decision to stop an automobile without a warrant is reasonable where the police have probable cause to believe that a traffic violation has occurred. Further, it is reasonable to stop a car where the police merely have a reasonable suspicion to believe the driver has committed a traffic violation." *Chargualaf*, 2001 Guam 1 ¶ 17 (citations omitted). "In order to determine whether an officer had reasonable suspicion sufficient to warrant a traffic stop, the court must look at the totality of the circumstances, taking into account the facts known to the officers from personal observation." *Johnson*, 1997 Guam 9 ¶ 6 (citation and quotation marks omitted). Furthermore, the reasonable suspicion must exist at the time the stop was initiated. *Id.* (citation omitted). Reasonable suspicion requires "'some minimal level of objective justification' for making a stop, but considerably less than the level of suspicion required for probable cause." *People v. Mansapit*, 2016 Guam 30 ¶ 13 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Here, Mendiola concedes that the initial detention for purposes of the traffic violation was valid but argues that "officers illegally detained [him] when they removed him from the vehicle and questioned him about the possible presence of drugs or weapons inside the vehicle." (Mendiola Mot. Suppress at 3, Jan. 23, 2025). Gaza disputes that the initial detention for the traffic violation was valid, arguing that it was pre-textual and the Government has failed to prove it was valid in light of the officers' conflicting testimony about following the vehicle on Governor Carlos Camacho Road. (Gaza Proposed D&O, Mar. 18, 2025).

The Court finds that initial stop was a valid traffic stop based on Officer De Chavez's testimony that he observed the Kia speeding on Governor Carlos Camacho Road, pacing it at forty-five miles per hour, and then speeding on Route 1, pacing it at around fifty miles per hour. *See* 16 GCA § 3301. Although Sergeant Cepeda could not recall getting behind the vehicle on Governor Carlos Camacho Road and testified that they were not able to catch up to the vehicle until it had just turned right onto Route 1, the Court notes that he was the passenger of the vehicle, not the driver, and he could also not recall whether he and Officer De Chavez were at the parking lot of Shirleys or Onward when they received information about the Kia being at the Granada Apartments. Further, the lawfulness of a traffic stop does not depend on the subjective motivations of the police officer. *See Whren v. United States,* 517 U.S. 806, 813 (1996); *United States v. Taylor,* 596 F.3d 373, 378 (7th Cir. 2010) ("the subjective motivations of the agents are irrelevant to the Fourth Amendment analysis.").

The Court must next determine whether the initial detention for the traffic violation ended and, if so, whether the defendants were subjected to a subsequent detention. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate that purpose.'" *Rodriguez v. United States,* 575 U.S. 348, 354 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.* (citation omitted).

Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Id.* at 355 (internal citations, quotation marks and alterations omitted").

Here, Officer De Chavez testified that Gaza gave him his driver's license and registration and that there were no issues with the documents. Gaza and Mendiola were asked to step out of the vehicle and patted down for weapons. Officer De Chavez testified that after he finished the pat down, he asked Gaza for permission to search the vehicle. Gaza seemed hesitant to give a response and said he wasn't sure. Officer De Chavez requested permission again and Gaza stated no. The Court finds that Officer De Chavez asking whether or not he could search the vehicle indicates the original investigation of the traffic violation ended, as such inquiry was unrelated to the traffic violation of speeding.

"Investigative questioning regarding criminal activity does not, in itself, implicate the Fourth Amendment." *Chargualaf,* 2001 Guam 1 ¶ 20 (citing *Florida v. Royer,* 460 U.S. 491 (1983)). "Obviously, not all personal intercourse between policemen and citizens involves 'seizure' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Florida v. Bostick,* 501 U.S. 429, 434 (1991) (citing *Terry v. Ohio,* 392 U.S. 1, 19, n. 16 (1968)). *See also Chargualaf,* 2001 Guam 1 ¶ 20 ("the Fourth Amendment is only at issue where the police detain or seize an individual while posing investigative questions."). Here, Officer De Chavez testified that the blue lights on his unmarked vehicle were on during the entire encounter. Additional officers and their vehicles were also present at the scene. Although Officer De Chavez testified that the defendants would have been free to go if they had asked, Officer De Chavez never specifically told Gaza that he was free to leave. Gaza was able to provide both a valid driver's license and vehicle registration, however, Officer De Chavez could not recall if he gave Gaza his driver's license and registration back. Instead of issuing a traffic citation or giving Gaza

a warning regarding his speeding, Officer De Chavez had Gaza exit the vehicle. Sergeant Cepeda testified that Gaza and Mendiola were detained when they were asked to exit the vehicle and would not be able to leave until the officers "did what they needed to do." Gaza and Mendiola were not standing next to each other or by themselves. Gaza was standing next to Officer Roman and Mendiola was standing next to Sergeant Cepeda. Therefore, the Court finds that Gaza and Mendiola were detained at this time. Police may only further detain a driver following a traffic stop when reasonable suspicion exists that the driver is engaged in criminal activity. *See Rodriguez*, 575 U.S. at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."). Accordingly, Officer De Chavez would have to have developed reasonable suspicion of a new offense while he was in the process of completing his original mission in stopping the vehicle for the traffic violation.[1]

"Reasonable suspicion is present when, considering the totality of the circumstances, there is both a particularized and an objective basis for suspecting the individual stopped of criminal activity." *United States v. Dapolito*, 713 F.3d 141, 148 (1st Cir. 2013) (internal quotation marks omitted). Here, Officer De Chavez was candid that he asked Gaza to step out of the vehicle because he wanted to talk to him and get into the vehicle. Prior to asking Gaza to exit the vehicle, Officer De Chavez had only seen a clear cylinder-shaped container in the vehicle with what appeared to be pills inside. Officer De Chavez could not identify the type of pill from outside the vehicle. Officer De Chavez acknowledged that there was nothing about the cylinder alone which suggested its only purpose was for criminal activity. An unlabeled pill bottle, in and of itself, does not necessarily constitute probable cause for a search or seizure. *See, e.g., People v. Williamson*, 608 N.E.2d 943, 950 (Ill. App. 1993) ("Nothing about a prescription bottle is so unique that it would immediately suggest criminal activity. While there is a chance a prescription bottle may contain a controlled substance, it is equally, if not more, likely to contain a number of

---

[1] In 2013, the Guam Legislature specifically repealed and re-enacted 16 G.C.A. § 9108 to change violations of Title 16 from a petty misdemeanor to a civil violation punishable by a fine. *See* P.L. 32-027 (May 10, 2013).

innocent objects such as a valid prescription, aspirin, thumbtacks or nothing at all. Probable cause requires more than simply having seen an item associated with criminal activity on an earlier occasion."), *abrogated on other grounds by People v. Gipson*, 786 N.E.2d 540 (Ill. 2003)). "An officer can draw on his or her training and experience to make reasonable inferences under the circumstances, but training and experience alone are not an adequate substitute for objectively observable facts." *State v. Mock*, 485 P.3d 295, 301–02 (Or. App. 2021) (citation omitted).

Although the vehicle was seen at and leaving a target location under surveillance, there was no testimony that Gaza or Mendiola appeared to be under the influence throughout their interactions with the officers. Gaza was able to provide his driver's license and vehicle registration, which Officer De Chavez verified. There was no testimony that Gaza or Mendiola had weapons or contraband discovered on them during the pat downs. Officer De Chavez noted a change in Gaza's responses when he asked to search the vehicle, which appeared to be nervousness, however, "[t]hat the defendant exhibited signs of nervousness and evasiveness in the context of an involuntary police encounter cannot, without more, generate reasonable suspicion." *Commonwealth v. Cordero*, 74 N.E.3d 1282, 1289 (Mass. 2017). *See also United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to police presence"). Further, as noted earlier, at this point, the original investigation of the traffic violation ended. While there was also testimony about Officer De Chavez observing what appeared to be a firearm magazine on the driver's seat (which he later clarified that he wasn't too sure what the item was because of the angle he was viewing it from and he was not familiar with that type of magazine) and a closed black hard plastic type case in the back seat (which he suspected to be a rifle case and went to ask Gaza to confirm), these observations were made after Gaza refused to give consent to search the vehicle and Officer De Chavez went back to look into the vehicle with a flashlight. Accordingly, the Court does not find that Officer De Chavez's observations at the time he asked Gaza for consent to search the vehicle were enough to constitute particularized reasonable suspicion to extend the duration of the traffic stop. The Court therefore grants Defendants' Motion to Suppress.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS the Defendants' Motion to Suppress. Parties shall return for a Pre-Trial Conference on August 5, 2025 at 9:30 a.m.

**IT IS SO ORDERED** this _7th_ day of July, 2025.

HONORABLE VERNON P. PEREZ
Judge, Superior Court of Guam

*People v. Gaza & Mendiola*
Case No. CF0825-24
Decision and Order